IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| KIMBERLY LAFFERTY, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:13-cv-00049 |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner, | ) | |
| Social Security Administration, | ) | By:   Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

## REPORT AND RECOMMENDATION

Plaintiff Kimberly Lafferty asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. This Court has authority to decide Lafferty's case under 42 U.S.C. §§ 405(g) and 1383(c)(3), and her case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that the Commissioner's final decision is supported by substantial evidence and should be affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

1

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See* 20 C.F.R. § 416.920(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667

F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Lafferty protectively filed for SSI on June 30, 2010. *See* Administrative Record ("R.") 82. At the time, she was 40 years old and had worked for many years as a cashier. *See* R. 72, 82, 167. Lafferty said that she stopped working in July 2008 because of a host of medical conditions, including fibromyalgia, degenerative disc disease, and carpal tunnel syndrome ("CTS"). *See* R. 166. She later clarified that she stopped working to care for her sick child and occasionally worked while her application was pending. R. 51, 73–74, 166. A state agency denied Lafferty's application initially and upon reconsideration. R. 81–90, 91–104.

Lafferty appeared *pro se* at a hearing before an Administrative Law Judge ("ALJ") on March 21, 2012. *See* R. 16, 36–39. She testified as to many of her alleged impairments and the limitations they had on her daily activities. *See* R. 51–63. Her husband, Roger Lafferty ("Mr. Lafferty"), and a vocational expert ("VE") also testified. *See* R. 66–70, 71–78.

In a written decision dated May 22, 2012, the ALJ found that Lafferty was not disabled after June 30, 2010. R. 16–28. The ALJ found that Lafferty suffered from severe fibromyalgia, degenerative disc disease, and diabetes mellitus. R. 18. He found that Lafferty's "carpal tunnel syndrome and nerve problems" were non-severe impairments because a consultative examiner noted that her prognosis was "fair" and, with one exception, Lafferty "did not have any physical exams or complaints indicating that her [CTS] even minimally affected her ability to carry out

basic work-related activities."[1] R. 19. None of Lafferty's severe impairments met or medically equaled an impairment listed in the Act's regulations. R. 21.

The ALJ next determined that Lafferty had the residual functional capacity ("RFC")[2] to perform light work[3] with additional environmental, manipulative, and postural limitations. R. 22. Finally, relying on the VE's testimony, the ALJ concluded that Lafferty was not disabled because she could return to her past work as a cashier as that job is "actually [or] customarily performed." R. 28. The Appeals Council declined to review the ALJ's decision on July 2, 2013, R. 1, and this appeal followed.

### III. Discussion

Lafferty objects to the ALJ's finding that she can perform light work as long as she only "occasionally" reaches overhead or pushes and pulls with her right arm. *See generally* Pl. Br. 12–15, ECF No. 17. Lafferty argues that the ALJ erred in weighing the opinions of consultative examiner Dr. Charles Scott, M.D., which Lafferty asserts limited her to sedentary work[4] with additional reaching and manipulative restrictions. *See id.* at 12–14. She also objects that the ALJ did not properly evaluate her credibility. *See id.* at 14–15.

---

[1] The ALJ also thoroughly explained why Lafferty's other alleged impairments were "non-severe." *See* R. 18–21. Lafferty does not challenge these findings on appeal.

[2] "RFC" is an applicant's ability to work "on a regular and continuing basis" despite his or her impairments. Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *1 (Jul. 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the applicant's record, 20 C.F.R. § 416.945(a), and reflects the "total limiting effects" of the person's impairments, *id.* § 416.945(e).

[3] "Light work" involves "lifting no more than 20 pounds at a time" but "frequently" lifting or carrying objects weighing up to 10 pounds. 20 C.F.R. § 416.967(b). Work in this category often requires "a good deal of standing or walking" or "involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* A person who can do light work generally can also perform "sedentary" work. *Id.*

[4] "Sedentary work involves lifting no more than 10 pounds a time and occasionally lifting or carrying [objects] like docket files, ledges, and small tools. . . . Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

4

A. *Medical Opinions*

ALJs must weigh each medical opinion[5] in the applicant's record. 20 C.F.R. §
416.927(c). The regulations classify these opinions by their source: those from treating sources
and those from non-treating sources. *See id.* Opinions from non-treating sources are not entitled
to any particular weight. *See id.* Rather, the ALJ must consider certain factors in determining
what weight to give such opinions, including the source's familiarity with the applicant, the
weight of the evidence supporting the opinion, the source's medical specialty, and the opinion's
consistency with the full record. *See id.* Ultimately, it is the ALJ's job to determine whether the
evidence of record supports the opinion. *See Bishop v. Comm'r of Soc. Sec.*, --- F. App'x ---,
2014 WL 4347190, at *1 (4th Cir. Sept. 3, 2014) (per curiam).

If the ALJ's final RFC assessment conflicts with a medical opinion, he must explain why
that opinion was not adopted in full. *See Davis v. Colvin*, No. 4:13cv35, slip op. at 6 (W.D. Va.
Jul. 14, 2014) (Hoppe, M.J.), *adopted by* 2014 WL 3890495 (Aug. 7, 2014) (Kiser, J.). His
"decision 'must be sufficiently specific to make clear to any subsequent reviewers the weight
[he] gave' to the opinion and 'the reasons for that weight.'" *Young v. Colvin*, 7:12cv468, 2014
WL 991712, at *3 (W.D. Va. Mar. 13, 2014) (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at
*5 (Jul. 2, 1996)). As always, the ALJ's choice between conflicting evidence must be supported
by substantial evidence in the record. *See Johnson*, 434 F.3d at 656.

1. *Dr. Scott's Opinion*

The agency arranged for Dr. Scott to examine Lafferty because the evidence in her record
was insufficient to support a reconsidered decision on her claim. *See* R. 96. On March 23, 2011,

---

[5] "Medical opinions are statements from . . . acceptable medical sources that reflect judgments
about the nature and severity of [the applicant's] impairment(s)," including the applicant's
symptoms, diagnosis, and prognosis; what the applicant can still do despite his or her
impairment(s); and the applicant's physical or mental restrictions. 20 C.F.R. § 416.927(a)(2).

Lafferty told Dr. Scott that "pain is generally the main issue that she has with being unable to work." R. 262. "When asked specifically what causes her to be unable to work," Lafferty reported "that her hands bilaterally give her pain," "the nerves in [her] neck are pinched," she has "bulging discs in her back," and she gets a migraine when she stoops or bends over. R. 261. She further explained that writing, smoking, turning her head, and standing for more than "maybe 10 minutes" exacerbated her pain. *Id.* Relief for all symptoms "mainly include[d] rest." *Id.*

Dr. Scott noted that Lafferty was "morbidly obese" and that it took "a little bit of time and effort for her to get on and off the table." R. 262, 263. He opined in passing that Lafferty "would have a much easier time" walking, standing, and sitting if she lost "a substantial amount of weight." R. 263. Dr. Scott also observed that, although Lafferty's "portrayal of [her] symptoms and statements appear[s] to be consistent with the [July 1, 2010,] clinic notes she brought in[,] and . . . w[as] consistent throughout the exam," Lafferty "did not quite give her best effort during [this] examination." R. 264.

On exam, Dr. Scott found that the range of motion in Lafferty's cervical spine was noticeably limited[6]: extension to 20 degrees, lateral flexion to 15 degrees bilaterally, and rotation to 20 degrees bilaterally. R. 260. Flexion was normal to 50 degrees. *Id.* Lafferty also had normal range of motion in her left shoulder, but limited[7] range of motion in her right shoulder: abduction to 70 degrees active and 75 degrees passive, forward elevation to 70 degrees active and passive, external rotation to 20 degrees active and 30 degrees passive, and extension to 0 degrees active

---

[6] Normal ranges of motion for the cervical spine (*i.e.*, the vertebrae in the neck) are: (1) extension, 0 to 50 degrees; (2) lateral flexion, 0 to 45 degrees bilaterally; (3) rotation, 0 to 80 degrees bilaterally; and (4) flexion, 0 to 50 degrees. R. 260. One day earlier, Lafferty's treating physician observed "full" range of motion in Lafferty's neck. R. 254.

[7] Normal ranges of motion for the shoulder are: (1) abduction, 0 to 150 degrees; (2) forward elevation, 0 to 150 degrees; (3) internal rotation, 0 to 80 degrees; (4) external rotation, 0 to 90 degrees; (5) adduction, 0 to 30 degrees; and (6) extension, 0 to 40 degrees. R. 260.

6

and passive. R. 260, 263. Dr. Scott was unable to examine Lafferty's right wrist, hand, and fingers because she refused to take off her wrist brace. *See* R. 260, 263. However, he later reported that Lafferty had full strength in both upper extremities. R. 263.

Lafferty also had normal active and passive ranges of motion in both hips, knees, and ankles. R. 260. Dr. Scott noted that the range of motion in Lafferty's thoracolumbar spine was normal with two exceptions: her flexion was limited to 45 degrees and her extension was limited to 20 degrees.[8] R. 260. Lafferty had a "mildly antalgic gait but [was] otherwise steady on her feet." R. 262. She also had full strength in both lower extremities. R. 263.

Dr. Scott opined that Lafferty could: (1) stand for approximately 90 minutes in an eight-hour day with normal breaks, (2) sit for seven hours in an eight-hour day with normal breaks, and (3) occasionally carry 20 pounds and frequently carry 10 pounds, but (4) "should only occasionally do any bending and stooping." R. 264–65. Dr. Scott did not explain his reasons for imposing these specific restrictions. *See generally* R. 264–65.

Dr. Scott also opined that Lafferty "would only have manipulative limitations on reaching, handling, feeling, grasping or fingering if she were having difficulty with carpal tunnel, but she should probably continue to wear her [wrist] brace which would help with these symptoms." R. 265. He noted that Lafferty's CTS prognosis was "fair" because she had "just started Neurontin" and cervical therapy. R. 264. Dr. Scott also noted that Lafferty's fibromyalgia prognosis was "fair to good" given her own report that she responded well to medication for both fibromyalgia and rheumatoid arthritis. *Id.* Finally, he opined that the prognosis for Lafferty's degenerative disc disease—which Lafferty cited as the reason she could stand for "maybe 10 minutes"—was "fair." *Id.* Dr. Scott did not explain this prognosis. *See id.*

---

[8] Normal flexion and extension in the thoracolumbar spine are 0 to 90 degrees and 0 to 25 degrees, respectively. R. 260.

2.    *The ALJ's Opinion Analysis*

The ALJ gave Dr. Scott's opinion "some weight" in formulating Lafferty's RFC for light work with "occasional" pushing, pulling, and overhead reaching. R. 27. He acknowledged that Dr. Scott examined Lafferty, considered her medical records, and personally observed limited range of motion in her spine and right shoulder "in forming his medical opinion." *Id.* The ALJ expressly rejected Dr. Scott's 90-minute standing restriction and "occasional" postural restrictions because he found that they "relied too heavily on [Lafferty's] subjective complaints." *Id.* The ALJ also cited Dr. Scott's opinion regarding Lafferty's "fair" CTS prognosis to support his finding that Lafferty's CTS and "nerve problems" were non-severe impairments. R. 19.

3.    *Analysis*

Lafferty argues that the ALJ erred in finding that Dr. Scott's "opinion that [Lafferty] would be limited to sedentary work in terms of her ability to sit and stand" was "simply based on [Lafferty's] subjective complaints." Pl. Br. 13. She also argues that the ALJ "should have given greater weight" to Dr. Scott's opinion that Lafferty "has limitations regarding reaching, handling, fingering, and feeling" because that opinion is "consistent with the medical evidence . . . and supported by the objective, clinical findings in the record." Pl. Br. 14. Lafferty asserts that the ALJ "would have found [that she] is disabled from all substantial gainful employment" if he "had given greater weight" to these portions of Dr. Scott's opinion. *Id.*

These arguments are without merit. Dr. Scott's RFC assessment does not necessarily limit Lafferty to sedentary work. *See generally* Pl. Br. 11–14. Dr. Scott opined (and the ALJ agreed) that Lafferty could occasionally carry 20 pounds and frequently carry 10 pounds, *see* R. 265, 22, which is what "light work" demands. *See* 20 C.F.R. § 416.967(b). Dr. Scott also opined that Lafferty could stand for 90 minutes and sit for seven hours during a normal workday. The

8

ALJ found that Lafferty could stand, walk, and sit for six hours each during a normal workday and "occasionally" reach overhead or use her right arm to push or pull objects weighing up to 20 pounds. *See* R. 22, 27, 100.

A person who can lift up to 20 pounds can "perform 'light work' only if he or she is able to do a good deal of walking or standing, *or* do some pushing and pulling of arm *or* leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1990) (emphasis added); *accord* 20 C.F.R. § 416.967(b) ("[A] job is in this category when it requires a good deal of walking or standing, *or* when it involves *sitting most of the time* with *some* pushing and pulling of arm *or* leg controls." (emphasis added)). At most, Dr. Scott's standing restriction rules out light jobs that require Lafferty to be on her feet most of the day. *See* 20 C.F.R. § 416.967(b). It does not disqualify her from *all* light work, *cf. Patterson v. Colvin*, No. 5:12cv63-RLV-DCK, 2013 WL 3035792, at *4 (W.D.N.C. June 17, 2013) ("[T]he plain language of 20 C.F.R. § 404.1567(b) does not require that a claimant be classified as sedentary, even if [she] is limited to two hours of walking or standing in a workday."), and the ALJ's RFC does not contemplate that Lafferty can physically perform the full range of light work, *see* R. 22, 27, 28. Thus, Dr. Scott's opinion does not conflict with the ALJ's RFC assessment in this respect.

The primary difference between Dr. Scott's opinion and the ALJ's RFC assessment concerns the amount of time that Lafferty can stand during an eight-hour workday.[9] *Compare* R. 264–65, *with* R. 22, 27. Dr. Scott opined that Lafferty could stand for approximately 90 minutes with normal breaks, R. 264, while the ALJ found that Lafferty could stand for about six hours under the same conditions, *see* R. 22.

---

[9] Lafferty does not challenge the ALJ's rejection, R. 27, of Dr. Scott's opinion that Lafferty "should only occasionally do any bending or stooping," R. 265. *See generally* Pl. Br. 13–14.

The ALJ's figure came from the two state agency physicians' RFC assessments completed in October 2010 and March 2011. *See* R. 27, 87, 100. The ALJ noted that both RFC assessments "appeared to take into account [Lafferty's] repeated complaints of back pain and continued treatment for her fibromyalgia and back pain" and "accurately account[ed] for [the] limitations stemming from her DDD [degenerative disc disease] and fibromyalgia." *Id.*; *see also* R. 28 (explaining that his RFC assessment is supported by the state agency physicians' medical opinions). However, the ALJ gave greater weight overall to the March 2011 RFC assessment by Dr. Joseph Duckwall, M.D., because he had access to Lafferty's updated medical record, including the report of Dr. Scott's recent consultative exam. R. 27.

The medical evidence at Dr. Duckwall's disposal in late March 2011 consisted largely of treating-source notes documenting treatment for fibromyalgia, rheumatoid arthritis, and spondylothiseheis despite generally benign findings on exam. *See* R. 93–94, 97. Dr. Duckwall cited these records in support of his finding that Lafferty could stand for about six hours in a normal workday. *See* R. 100, 102; *see also* R. 104 (explaining that Lafferty's physical impairments, while painful, did not "completely limit [her] ability to stand, walk, and move about within normal limits"). He also explained that Dr. Scott's more restrictive assessment was "an overestimate of the severity of [Lafferty's] restrictions/limitations and based on only a snapshot of [her] functioning." R. 103.

The ALJ can rely on a state agency physician's RFC assessment when that assessment is consistent with the record. *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (noting in addition that a non-examining physician's opinion "is not substantial evidence when totally contradicted by other evidence in the record"). As the ALJ noted, Dr. Duckwall's "less-than-light" RFC assessment is consistent with the medical evidence available to him as of March 29,

2011. *See* R. 27 (giving Dr. Duckwall's RFC assessment "great weight" because he "had access to [Lafferty's] medical record, including her recent consultative exam from March 2011 and appeared to accurately account for [Lafferty's] limitations stemming from her DDD and fibromyalgia").

Medical evidence produced after that date further supports the ALJ's decision to credit Dr. Duckwall's six-hour standing restriction over Dr. Scott's 90-minute restriction. On June 21, 2011, for example, Lafferty's treating physician, Dr. Richard Cole, M.D., medically cleared Lafferty to drive a school bus, R. 297, a job that the VE classified as "medium"[10] work, R. 74–75. The ALJ gave Dr. Cole's opinion "little weight" because he found that it went "against the less-than-light opinions of the State agency physicians and consultative examiner and [was] not supported by [Lafferty's] reported symptoms." R. 27. Nonetheless, it was reasonable for the ALJ to conclude that Dr. Cole's opinion undermined Lafferty's argument that she cannot work at all. *See id.*

Further, the ALJ did not find that Dr. Scott's opinion was "simply based upon" Lafferty's subjective complaints. Pl. Br. 13; *see* R. 27. He acknowledged that Dr. Scott examined Lafferty and "noted such objective signs as limited range of motion in her [shoulder, neck, and lumbar spine] in forming his medical opinion." R. 27. The ALJ rejected Dr. Scott's standing restriction because he found that particular limitation "relied too heavily on [Lafferty's] subjective complaints." *Id.*

Although the ALJ did not fully explain this finding, he gave a "specific and legitimate" reason for rejecting this aspect of Dr. Scott's opinion. *Bishop*, 2014 WL 4347190, at *1. The

---

[10] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weight up to 25 pounds. If someone can do medium work, [the agency] will determine that he or she can also do sedentary and light work." 20 C.F.R. § 416.967(c).

ALJ may give "significantly less weight" to even a treating physician's "conclusory opinion [that is] based on the applicant's subjective reports of pain." *Craig v. Chater*, 75 F.3d 585, 590 (4th Cir. 1996). He certainly may reject such an opinion from a physician who examined the applicant one time if his reason for doing so is supported by substantial evidence in the record. *See* 20 C.F.R. § 416.927(c)(2)–(3).

Substantial evidence supports the ALJ's decision. For example, Lafferty told Dr. Scott, "'I got bulging discs in my back,' and 'I can't stand for a long time, maybe 10 minutes.' When I stoop or bend over, I get a migraine headache.'" R. 261. These complaints mirror Dr. Scott's opinion that Lafferty "could be expected to stand approximately 1-1/2 hours in an 8-hour workday with normal breaks" and "should only occasionally do any bending or stooping." R. 264–65. Conversely, Lafferty did not report any difficulty sitting for long periods. *See* R. 261–65. This omission is consistent with Dr. Scott's opinion that Lafferty "should be expected to sit for 7 hours in an 8-hour workday." R. 264. Notably, Dr. Scott did not state that his opinions were "based on" anything, much less his objective findings on exam. *See* R. 264–65; *cf. Sydnor v. Colvin*, No. 4:13cv41 slip op. at 23 (W.D. Va. Sept. 2, 2014) (Hoppe, M.J.) (substantial evidence did not support ALJ's conclusory finding that a medical opinion "essentially adopt[ed] Sydnor's statements without balance or objectivity" where the physician "stated that his opinion was 'based on' [specific] examination findings"), *adopted by* 2014 WL 4792946 (Sept. 25, 2014) (Kiser, J.). And, although not directly related to Lafferty's standing restrictions, Dr. Scott's assessment of her CTS offers another example in support of the ALJ's rationale. Dr. Scott did not actually examine Lafferty's right hand and wrist because, although she claimed to suffer debilitating CTS in that hand, Lafferty refused to take off her wrist splint during the consultative exam. *See* R. 260, 261, 263. Yet, Dr. Scott reported that Lafferty had a "fair" prognosis for CTS

and assessed manipulative limitations related to this condition despite the lack of objective medical evidence available to him at the time.

Finally, Lafferty does not explain how certain "objective medical findings substantially support" Dr. Scott's opinion that she can stand for only 90 minutes during the workday. Pl. Br. 13 (citing R. 260, 266, 242–46, 255–57, 281, 283, 291). March 23, 2011, diagnostic images of Lafferty's lumbar spine showed that even her "most severe" degenerative changes were nonetheless "mild" and "minimal" with "[n]o acute disease." R. 266. Dr. Scott's findings that Lafferty had "limited" range of motion in her neck and lower back appear to be outliers. *Compare* R. 260, 263 (finding limited range of motion in the neck and lower back), *with* R. 237–38, 242, 243, 246, 254, 256, 257, 280, 283, 290, 294 (finding normal or unremarkable range of motion in the neck and back between July 2009 and February 2012). The day before Dr. Scott's exam, Lafferty reported experiencing "shooting pain from the neck down the arms." R. 254. Dr. Cole noted that Lafferty was "[u]nable to fully abduct and external[ly] rotate" her right shoulder on this visit, but she had "full" range of motion in her neck. *Id.* Lafferty did not report lower back pain on this date, and Dr. Cole's treatment notes do not document limited range of motion or tenderness on exam. *See id.* Dr. Cole added a new pain medication and instructed Lafferty to return in three months. *See* R. 254–55. He did not suggest that Lafferty limit her physical activity or comment on her ability to stand. *See id.*

The fact that Dr. Cole diagnosed Lafferty with fibromyalgia, rheumatoid arthritis, and spondylolisthesis does not support Dr. Scott's standing restriction, as Dr. Cole never limited Lafferty's activity based on these diagnoses. *See* R. 242–46, 255–57, 281, 283, 291. On the contrary, Lafferty often told Dr. Cole that her "activity tolerance [was] fairly good," she was "trying" to exercise, and she was "able to function and concentrate on her housework" with pain

medication. R. 246, 290, 295; *see also* R. 242, 256, 280, 282. Consistent with Lafferty's reports, Dr. Cole often did not document any musculoskeletal abnormalities, pain, or stiffness on exam between July 2010 and March 2012. *See, e.g.*, 242, 257 (July and Sept. 2010); R. 255, 282 (Mar. and June 2011); R. 294, 296 (Feb. and Mar. 2012). Dr. Cole documented "some tenderness" or "mild[] tender[ness]" around the lumbosacral area on four occasions, but he never noted any objective findings that Lafferty experienced reduced range of motion in her lower back. *See* R. 244 (Jan. 2010); R. 245–46 (July and Oct. 2009); R. 281 (Sept. 2011).

In any event, the "mere diagnosis of an impairment does not establish that a condition is disabling; there must be a showing of related functional loss." *Cowles v. Colvin*, 5:12cv129, 2014 WL 1207984, at *11 (W.D. Va. Mar. 24, 2014) (internal quotation marks omitted). Although most of Dr. Cole's treatment notes document diagnoses of fibromyalgia, rheumatoid arthritis, and spondylolthesis, these diagnoses alone "do not establish that [Lafferty] suffers from any particular symptoms or limitations." *Felton-Miller v. Astrue*, 459 F. App'x 226, 230 (4th Cir. 2011).

Lafferty also argues that the ALJ implicitly "rejected Dr. Scott's opinions regarding [her] manipulative limitations." Pl. Br. 13. She notes that, while the ALJ limited her to "occasional" pushing, pulling, and reaching overhead, he did not accept "[t]he additional limitations outlined by Dr. Scott regarding all other reaching, handling, feeling, grasping[,] or fingering." *Id.* Lafferty argues that Dr. Scott's "opinions are consistent with" his finding that she had limited range of motion in her right shoulder on March 23, 2011. *Id.* at 14. She does not cite specific evidence that she believes supports Dr. Scott's "additional" fine-motor limitations. *See id.* at 13–14.

Dr. Scott said that Lafferty "would *only* have manipulative limitations on reaching, handling, grasping, or feeling *if* she were having difficulty with carpal tunnel, but she should

14

probably continue to wear her brace which would help with these symptoms." R. 265 (emphasis added). He did not say how often, if ever, Lafferty might be hampered by CTS. *See id.* Nor did he identify specific restrictions on what Lafferty "can still do despite" this impairment. 20 C.F.R. § 416.927(a)(2). Dr. Scott simply noted that Lafferty's CTS prognosis was "fair" in March 2011 because she had "just started Neurontin [and] cervical therapy." R. 264. The ALJ cited this prognosis to support his finding that Lafferty's "carpal tunnel syndrome and nerve problems" were non-severe impairments. R. 19.

The ALJ also found that, except during one March 2011 check-up, Lafferty "did not have any physical exams or complaints indicating that her [CTS] even minimally affected her ability" to perform basic work activities like pushing, pulling, reaching, or handling. R. 19 (citing R. 280–83, 293–98). Treatment notes and diagnostic imaging studies produced between July 2009 and March 2012 overwhelmingly support this finding. *Compare* R. 254 (noting complaints of numbness in the hands and fingers on March 22, 2011), *with* R. 237–39, 242, 243, 246, 254, 256, 257, 260, 263, 268, 280, 282–83, 293–94, 297–98; *but see* R. 244 (noting "some tenderness" and stiffness with range of motion in the hands on exam in January 2010). Most of Dr. Cole's objective findings on exam do not mention Lafferty's hands at all. *See, e.g.*, R. 246, 254 (Oct. and July 2009); R. 242, 256, 257 (Apr., Sept., and Dec. 2010); R. 281, 282, 291 (June, Sept., and Dec. 2011); R. 294, 296 (Feb. and Mar. 2012). Those that do document Dr. Cole's findings show that Lafferty's hands were without redness, warmth, tenderness, or joint swelling. *See, e.g.*, R. 242 (July 2010), 254 (Mar. 2011) This was true even on the one occasion that Lafferty reported numbness in her hands and fingers "causing her to drop things." R. 254. Dr. Cole started Lafferty on Neurontin, but he did not express concern that she might be suffering from CTS at that time.

15

*See id.* Furthermore, an imaging study of Lafferty's right hand conducted on March 23, 2011, was "negative" with no evidence of bone destruction or focal soft tissue swelling. R. 267.

The ALJ's findings regarding Lafferty's fine-motor function also are supported by Dr. Duckwall's identical RFC assessment, which the ALJ noted was based on Lafferty's medical records as of March 29, 2011, including Dr. Cole's treatment notes and Dr. Scott's recent consultative examination report. *See* R. 27, 93–94, 100–03. Dr. Cole's treatment notes produced after that date do not conflict with an RFC for "unlimited" fine-motor function and "occasional" pushing, pulling, and reaching overhead with the right arm. *See* R. 280, 282, 290, 297 (June, Sept., and Dec. 2011); R. 293–96 (Feb. and Mar. 2012).

Accordingly, I am satisfied that the ALJ did not commit legal error in rejecting the challenged portions of Dr. Scott's opinion and that the ALJ's final assessment of Lafferty's RFC is supported by substantial evidence in the record.

B.      *Lafferty's Credibility*

Lafferty also argues that the ALJ "failed to articulate adequate reasons for rejecting" her complaints of disabling pain and that the reasons he gave "are not supported by substantial evidence" in the record. Pl. Br. 14. The Fourth Circuit recently reminded reviewing courts that they should accept an ALJ's credibility finding absent "exceptional circumstances." *Bishop*, 2014 WL 4347190, at *2 (citing *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)). "Exceptional circumstances include cases where a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Edelco*, 132 F.3d at 1011. In *Bishop*, the Fourth Circuit found that substantial evidence supported the ALJ's credibility determination because he "cited specific contradictory evidence and averred that the entire record had been reviewed." 2014 WL 4347190, at *2.

16

Lafferty's case is not one of exceptional circumstances. On the contrary, the ALJ's determination that Lafferty's statements were not credible reflects a careful and generally accurate review of the entire record.[11] *See* R. 22–28. The ALJ first summarized Lafferty's statements describing her pain and other symptoms, extremely limited daily activities, and perceived functional limitations. R. 22–23. *See* 20 C.F.R. § 416.929(c)(3). He also summarized Mr. Lafferty's testimony, which he found "corroborated" Mrs. Lafferty's statements. R. 22. He then reviewed each available medical record, paying special attention to Dr. Cole's treatment notes from July 2009 to March 2012.[12] R. 23–25, 27. *See* 20 C.F.R. § 416.929(c)(2). The ALJ also considered and weighed medical opinions from Drs. Cole and Scott, both of whom examined Lafferty at least once. R. 27. *See* 20 C.F.R. § 416.929(c)(1).

After reviewing all of this evidence, the ALJ found that Lafferty's degenerative disc disease, fibromyalgia, and diabetes could reasonably be expected to cause her alleged symptoms, but that Lafferty's statements describing the intensity, persistence, and limiting effects of those

---

[11] The ALJ erroneously found that Lafferty's "file [did] not include any x-rays, MRI testing or other imaging [studies] to confirm the extent" of her degenerative disc disease. R. 25. On March 23, 2011, diagnostic images of Lafferty's lumbar spine showed "degenerative changes at multiple levels most severe at L5-S1 with narrowing of the L5-S1 disc space, . . . multilevel facet arthropahty with minimal anterolisthesis of L5 on S1," and "mild osteoarthritis of the sacroiliac joints." R. 266. The reviewing radiologist noted that these images showed "[d]egenerative changes" but "[n]o acute disease" in Lafferty's lumbarsacrol spine. *Id.*

This error notwithstanding, I find it inconceivable that objective medical evidence of "mild" and "minimal" degenerative changes without acute disease would have changed either the ALJ's credibility finding or his conclusion that Lafferty still was capable of performing a limited range of light work. *See Kersey v. Astrue*, 614 F. Supp. 2d 679, 696 (W.D. Va. 2009) ("Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.").

[12] Although SSI cannot be paid before the date on which the claimant protectively filed her application, the ALJ in this case considered Lafferty's "complete medical history consistent with 20 C.F.R. § 416.912(d)." R. 16. "Complete medical history" means "the records of [the claimant's] medical sources covering at least the 12 months preceding the month in which" she filed her application. 20 C.F.R. § 416.912(d)(2). In Lafferty's case, the ALJ considered all available medical records dated after May 30, 2009. *See* R. 16, 18–21, 23–27.

17

symptoms were "not credible" to the extent that they were inconsistent with an RFC for a limited range of light work. R. 25, 26. He gave several specific, legitimate reasons for finding that Lafferty's allegations could not reasonably be accepted as consistent with the medical and other evidence in her record. R. 25–27. *See* 20 C.F.R. § 416.929(c)(4).

For example, the ALJ found that Lafferty received "minimal and conservative treatment" for her degenerative disc disease. R. 26. He correctly noted that Dr. Cole never recommended treatment beyond pain medication, much less that Lafferty use an adaptive device or undergo back surgery. R. 25–26; *see also* R. 242, 243, 244, 246, 256, 257, 280. He also identified several specific instances when Lafferty told Dr. Cole that her current medications "helped" or "controlled" her pain. R. 26; *see, e.g.*, R. 242, 256, 257, 264, 280, 282, 290, 293, 294. The ALJ may consider any medical treatment (or lack thereof) to alleviate pain when evaluating the applicant's credibility. 20 C.F.R. § 416.929(c)(3). "While there is 'no bright-line rule [for] what constitutes conservative versus radical treatment,'" the ALJ correctly found that Lafferty's only prescribed treatment consisted of taking medications, a course he reasonably deemed to be conservative and inconsistent with complaints of disabling pain. *Bolden v. Colvin*, No. 4:13cv32, slip op. at 17 (W.D. Va. Jul. 23, 2014) (Hoppe, M.J.) (quoting *Gill v. Astrue*, 3:11cv85-HEH, 2012 WL 3600308, at *6 (E.D. Va. Aug. 21, 2012)), *adopted by* 2014 WL 4052856 (Aug. 14, 2014) (Kiser, J.).

The ALJ also found that Lafferty's "training and work[] as a bus driver . . . weigh[ed] against her claims of disability." R. 26. In March 2012, Lafferty testified that she drove a school bus "two or three times" and was an "aide on the bus a couple of times" until February 2012. R. 73–74. Based on her testimony and earnings record, the ALJ found that Lafferty trained to become a school bus driver and aide between October 2011 and January 2012 and she "earned

18

some money doing this job from January until February 2012." R. 26. Lafferty argues that this "unsuccessful work attempt" actually "bolsters her credibility by showing that [she] was unable to maintain substantial gainful employment." Pl. Br. 15.

"Unsuccessful work attempt" is a term of art defined as work that "will not show that [the applicant is] able to do substantial gainful activity if, after working for a period of 6 months or less, [the applicant was] forced by [her] impairment to stop working or to reduce the amount of work that [she] did so that [her] earnings from such work fall below" a set earnings threshold. 20 C.F.R § 416.974(c)(1). In other words, "unsuccessful work attempts" do not prove that the person is *not* disabled. But they also "will not necessarily show" that the person *is* disabled. 20 C.F.R. § 416.974(a)(1). The ALJ may consider the applicant's recent work as he would any other evidence that is relevant to her credibility. *Blair v. Astrue*, No. 5:12cv112, 2012 WL 625001, at *4 (W.D. Va. Feb. 24, 2012) (collecting cases); 20 C.F.R. § 416.971.

The ALJ in this case carefully weighed Lafferty's work a school bus driver/aide against the other evidence in her record.[13] *See* R. 26, 27. For example, he correctly noted that Dr. Cole medically cleared[14] Lafferty to do a job that the VE classified as "medium work." *See* R. 27, 74–75, 297–98. He gave Lafferty "the benefit of the doubt in giving [Dr. Cole's] opinion little

---

[13]  Contrary to Lafferty's argument, the ALJ did not "find" that this was an "unsuccessful work attempt." Pl. Br. 15. Although the ALJ found that Lafferty's earnings for this job fell below the threshold for "substantial gainful activity," R. 18, he did not specifically find that Lafferty's *impairments* "forced" her to quit this job within six months. 20 C.F.R. § 416.974(c)(1), (c)(5).

[14]  On June 21, 2011, Dr. Cole completed a form certifying that Lafferty was physically qualified to work as a school bus driver. *See* R. 297–98. In signing this form, Dr. Cole certified that Lafferty did not have a "known medical history or clinical diagnosis of rheumatic, arthritic, orthopedic, muscular, neuromuscular, or vascular disease" or an impairment, structural defect, or other limitation on the "use of a foot, a leg, a hand, a finger, or an arm." R. 297, 298.

In March 2012, Lafferty testified that Dr. Cole "didn't want to" clear her for this job, but she insisted that she needed to support her family after her DDS "turned [her] down twice" for disability benefits. R. 50; *accord* Pl. Br. 15. Dr. Cole's contemporaneous treatment notes do not indicate any reluctance to sign this certification form. *See* R. 282, 297–98.

19

weight, as it [went] against the less-than-light opinions of the State agency physicians and consultative examiner and [was] not supported by [Lafferty's] reported symptoms." R. 27. Still, the ALJ reasonably concluded that Dr. Cole's clearance "goes against [Lafferty's] own allegations of severity and disability." *Id.* He also found that Lafferty's work attempt undermined her testimony that "she could not lift more than a gallon of milk and spent most of her time lying down," and corroborated her comment to Dr. Cole that "she was able to function and concentrate on doing housework on her current medication." R. 26, 60–63, 290. Such careful fact-finding deserves this Court's deference. *Edelco*, 132 F.3d at 1011.

## IV. Conclusion

This Court must affirm the Commissioner's final decision that a person is not disabled if the ALJ properly applied the law and if substantial evidence in the record supports his factual findings. I find that both requirements were met here. Therefore, I recommend that this Court **DENY** Lafferty's motion for summary judgment, ECF No. 16, **GRANT** the Commissioner's motion for summary judgment, ECF No. 18, and **DISMISS** this case from the active docket.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk

is directed to transmit the record in this matter to the Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: October 21, 2014

Joel C. Hoppe
United States Magistrate Judge